Filed 12/23/22  S.D. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| S.D., <br><br>     Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF CONTRA COSTA COUNTY, <br><br>     Respondent; <br><br> CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, <br><br>     Real Party in Interest. | A166363 <br><br> (Contra Costa County Super. Ct. No. MSJ21-00052) |

S.D. (Father), father of minor C.D., petitions for extraordinary relief pursuant to California Rules of Court, rule 8.452, after the juvenile court terminated family reunification services and scheduled a Welfare and Institutions Code[1] section 366.26 permanency planning hearing.  Father contends:  (1) the Contra Costa County Children and Family Services Bureau (Bureau) failed to comply with the notice requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.); and (2) the court

---

[1]     Further unspecified section references are to the Welfare and Institutions Code.

abused its discretion in terminating reunification services and setting the section 366.26 hearing. Father also requests a stay of the section 366.26 hearing until this petition is resolved. We deny the petition and request for a stay.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 11, 2021, the Bureau filed a section 300 petition alleging that then-newborn C.D. was at risk of harm in the care of his mother, B.B. (Mother), because of her chronic and untreated substance abuse. The Bureau alleged that Mother used heroin regularly and throughout her pregnancy; both she and C.D. tested positive for amphetamines and opiates at the child's birth; and C.D. was born addicted to opioids and displayed withdrawal symptoms. Father allegedly used methamphetamine and alcohol regularly and made multiple unsuccessful attempts to complete substance abuse treatment.

In its detention report, the Bureau reported that Father indicated he had Native American ancestry. Father lacked a stable living situation and was living on food stamps and Medi-Cal benefits. He and Mother had been friends for years but were not in a relationship. Mother told the Bureau she was unsure if Father would be involved in C.D.'s life.

At the detention hearing, the juvenile court ordered C.D.'s detention. The court also found that Father was the child's presumed father and that "there is reason to believe" C.D. was an Indian child.

In March 2021, Father filed a Parental Notification of Indian Status form (ICWA-020), stating he was a member of a federally recognized Indian tribe. He listed the name of his tribe as "Arctic Slope Regional Corporation" (ASRC) and the tribe's location as "Barrow." The Bureau later reported that a social worker contacted ASRC, asking for the name of a tribal

2

representative she could contact. The Bureau further reported that C.D. had been released from the hospital and that visitation had been arranged, but Father missed his first visit with C.D.

The jurisdiction hearing was continued several times while the Bureau attempted to obtain more ICWA information. In its June 2021 memorandum, the Bureau reported that Father was a stockholder in ASRC and a descendant of a resident of the Native Village of Barrow (NVB), and that a completed Notice of Child Custody Proceeding for Indian Child form (ICWA-030) had been mailed to ASRC, the Iñupiat Community of the Arctic Slope (ICAS), the California Department of Social Services Office of Tribal Affairs, and the Bureau of Indian Affairs (BIA). According to the Bureau, it was "clear that [C.D.] is eligible to become a stockholder in the ASRC like his father." The Bureau was in communication with Marie Ahsoak, Social Service Director of ICAS, informing her of the dependency proceedings, the date of the jurisdiction hearing, and the child's and Father's personal information. Ahsoak said she would "continue to research a tribe for this child" and provided information on how to enroll Father and the child in ASRC. The Bureau was also in contact with Marilee Gatten, Social Services Family Advocate for NVB, who instructed the Bureau to submit membership applications on behalf of Father and C.D.

In its jurisdiction report, the Bureau indicated that ICWA "does or may apply," as Father's maternal grandfather was from NVB; Father was a stockholder at large in ASRC; C.D. was eligible for membership in ASRC; and Father had requested that C.D. be enrolled in ASRC. The Bureau explained that the NVB "handles its own ICWA cases," and that Father was "getting himself and [C.D.] enrolled as members of" NVB and ASRC.

3

The Bureau further reported that Father "made progress in addressing problematic aspects of his past such as substance abuse and a criminal record," but he had "not been able to drug test due to the time intensive nature of his work for a moving company." The Bureau reported that the quality of Father's visits with C.D. was "satisfactory" but that Father had missed numerous visits over the review period.

The contested jurisdiction hearing was held in August 2021. Father pleaded no contest to an amended petition, and the juvenile court sustained a count under section 300, subdivision (b), that C.D. was at substantial risk of harm due to Father's chronic, untreated substance abuse. Mother did not appear at the hearing, and the court sustained the petition's allegations as to her under section 300, subdivision (b). During the hearing, the court made a telephone call to NVP family advocate Gatten and left her a message.

In October 2021, the Bureau reported that C.D. had been placed with his paternal uncle, who was "in the process of becoming a certified Resource Family." C.D. was transitioning well to the new placement. Although Father's visits were reportedly going well, he had missed or cancelled two visits and had not completed any drug testing. The Bureau continued to recommend reunification services for both parents.

In November 2021, the Bureau reported Gatten had determined that both Father and C.D. were eligible to become enrolled members of NVB. On September 8, 2021, the Bureau submitted enrollment applications (along with supporting documentation, such as a birth certificate and Social Security card) on behalf of C.D. to ASRC and on behalf of C.D. and Father to NVB. The Bureau informed Gatten of the date of the next hearing, as well as the Bureau's efforts to place C.D. with his paternal uncle, "who is both an enrolled member of [NVB] and a member of ASRC."

4

The disposition hearing took place on November 8, 2021. The parties stipulated to the admission of a declaration from an ICWA expert. In her declaration, ICWA expert Geni Cowan opined that it would be detrimental to place C.D. in the custody of either parent, and that placement with the child's paternal uncle was a preferred placement under ICWA, "as it maintains the Native family relations and affords the child an opportunity to be raised and taught the ways of his indigenous heritage." According to Cowan, the Bureau sufficiently addressed the requirements of ICWA by "providing active efforts and pursuing options for appropriate relative placement."

The juvenile court found C.D. to be a person described by section 300, subdivision (b), and adjudged him a dependent of the court. Finding by clear and convincing evidence that C.D.'s placement with either parent would be detrimental to the child's safety, protection, or physical or emotional well-being, the court ordered C.D.'s placement out of the parents' home, with reunification services for the parents. Father's case plan consisted of parenting education and random drug testing. The matter was continued for an interim review in December 2021, and a six-month review in April 2022.

In December 2021, the Bureau reported that a Thanksgiving visit between C.D. and Father had gone well. However, Father had four missed drug tests, which he attributed to his work schedule. The Bureau indicated it was attempting to accommodate Father's work schedule by referring him for drug tests on evenings and weekends.

In advance of the six-month review hearing, the Bureau filed a status report recommending termination of reunification services. The report indicated that paternal uncle had completed the "Resource Family Approval" process, was a registered member of NVB, and was "firm in asserting his

5

intention to provide the child with permanency through adoption." C.D. was "doing exceptionally well" in the home of paternal uncle.

Regarding ICWA, the Bureau reported that a social worker had contacted NVB regarding the status of Father's and C.D.'s enrollment applications, and a response was still pending. The Bureau provided notice of the six-month review hearing to NVB by certified mail, with return receipt requested.

The Bureau further reported that "neither parent has made any notable progress in addressing the issues that necessitated child welfare intervention." Mother had not made contact with the Bureau or participated in any visitation with C.D., and Father had "not engaged in any services" including submission to "substance abuse testing or enroll[ment] in parenting classes despite receipt of a referral" from the Bureau. The Bureau had attempted to accommodate Father's work schedule by changing his drug testing schedule and providing him with a referral for virtual parenting classes in the evenings, but Father was still unable to comply with his case plan objectives, saying he was " 'too tired at the end of the day to remember to test.' " Father had six "quality visits" with C.D. in April and May 2021, but several other visits were cancelled due to Father's failure to show or inability to confirm visits in advance. The Bureau found that despite Father's "contention that he desires visitation with his son to build their relationship and demonstrate his ability to care for the child, his lack of engagement and continuously prioritizing his work hours over his visits are inconsistent with those assertions."

At the six-month review hearing, the juvenile court found that "[n]otice has been given as required by law." The court set a contested review hearing

for June 6, 2022. The hearing was later continued to August 11, 2022, while Father's tribal enrollment application was pending.

At the continued hearing on August 11, the juvenile court noted on the record that it had received a letter from NVB indicating that C.D. was now a registered member of the tribe. Accordingly, the court found "reason to know" that C.D. was an Indian child. The court telephoned NVB and left a message before ordering "[o]ut of abundance of caution" that the matter be continued as the court awaited a response from NVB as to whether it wished to participate. The court continued the contested review hearing to August 29, 2022. The court also directed the Bureau to send written notice of the hearing to NVB and to include in the notice a Zoom video conferencing link so that the tribe could participate either in person or virtually.

On August 15, 2022, the Bureau served NVB with written notice of the contested review hearing. The notice included a Zoom link for virtual participation. The proof of service indicated that notice was served by both email and certified mail, with return receipt requested, to Shelley Kaleak, Social Services Director of NVB.[2] The Bureau received a signed return receipt showing acceptance by NVB on August 23, 2022.

Meanwhile, the juvenile court continued the review hearing to October 10, 2022. The Bureau filed an updated status review report maintaining its recommendation of termination of both parents' services. Although Father and C.D. had three visits that went "exceptionally well," Father had not engaged in any services, stating he was too tired or busy to participate in drug testing or parenting classes. On August 16, 2022, Father agreed to submit to an on-demand drug test on August 18, but later told the social

---

[2] The notice was also electronically served on Daira Pico at an NVB email address.

worker his work schedule made him miss the test.  However, the social worker learned from Father's employer that Father had not been employed since July 22, 2022, which negated that claim.  The employer also told the social worker he had been willing to accommodate Father's schedule, but Father would often request time off at the last minute.

Given the passage of time, the review hearing scheduled for October 10, 2022, became a contested six, twelve, and eighteen-month review.  At the hearing, the Bureau informed the juvenile court that NVB acknowledged receipt of the hearing notice but asked the Bureau not to serve notice on Kaleak because she no longer worked for the tribe.  The Bureau's counsel noted that at the time of the hearing, Kaleak was still listed as NVB's designated agent for service of process, and the tribe did not respond to a request for the name of the person to whom future notice should be mailed.  The court found there was sufficient notice to NVB and proceeded with the review hearing.

Father testified about his relationship with C.D. and explained that his inconsistent visitation was due to cancellations by paternal uncle and himself, transportation issues getting to Sacramento County where paternal uncle lived, and bad communication.  Father asked the juvenile court for more time so he could participate in an in-patient drug treatment program.

The juvenile court adopted the Bureau's recommendations and terminated reunification services to both parents.  The court found that the Bureau had made active efforts to facilitate visitation, drug testing, and drug treatment, that Father had made efforts to visit C.D. but that the visitations were not consistent, and that it was Father's responsibility to give sufficient notice to his employer to request time off work.  The court found beyond a reasonable doubt that custody with either parent was likely to cause serious

8

physical or emotional damage to C.D. and set the section 366.26 hearing for February 6, 2023.

## DISCUSSION

### A. ICWA Notice

" 'ICWA establishes minimum federal standards, both procedural and substantive, governing the removal of Indian children from their families' [citations], and '[w]hen ICWA applies, the Indian tribe has a right to intervene in or exercise jurisdiction over the proceeding.' " (*In re E.C.* (2022) 85 Cal.App.5th 123, 138.) California has adopted various procedural and substantive provisions of ICWA. (*Id.* at pp. 138–139.) Juvenile courts and child protective agencies have " ' "an affirmative and continuing duty to inquire" whether a child for whom a section 300 petition has been filed is or may be an Indian child.' " (*Id.* at p. 140.)[3]

" 'ICWA also imposes a duty to provide notice of the proceedings to the pertinent Indian tribes. [Citations.] Notice enables the tribes "to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in, or exercise jurisdiction over, the matter." ' " (*E.C.*, *supra*, 85 Cal.App.5th at p. 140.)

Father contends the Bureau's notice to NVB of the contested six, twelve, and eighteen-month hearing was not ICWA-compliant because once the Bureau learned that Kaleak no longer worked for NVB, the Bureau failed to either serve notice on NVB's tribal chairperson pursuant to section 224.3,

---

[3] An " 'Indian child' " means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); accord, § 224.1, subd. (a).) There is no dispute in this case that the juvenile court properly found C.D. was an Indian child with NVB as his tribe.

9

subdivision (a)(2), or seek BIA's assistance pursuant to 25 Code of Federal Regulations part 23.105. We are not persuaded, as Father's reliance on these authorities is misplaced.

Section 224.3 indicates in relevant part that, when an Indian child is involved in an Indian Child custody proceeding as described in section 224.1, subdivision (d)(1), notice of the proceeding must be sent by registered or certified mail with return receipt requested and "shall be to the tribal chairperson, unless the tribe has designated another agent for service." (§ 224.3, subd. (a)(1), (2).)[4] Section 224.1, subdivision (d)(1), defines an " 'Indian child custody proceeding' " as including a hearing during a juvenile court proceeding brought under the Welfare and Institutions Code, Probate Code, or Family Code, involving an Indian child, that may culminate in foster care placement, termination of parental rights, preadoptive placement, or adoptive placement.

Here, Father is challenging the notice provided for a contested six, twelve, and eighteen-month review hearing under sections 366.21 (dependency status review hearing) and 366.22 (permanency review hearing after continuance). Pursuant to sections 366.21 and 366.22, when a juvenile court removes a child from the parents, the court must hold periodic review hearings at six months, twelve months, and eighteen months. Generally

---

[4]     Notice must be sent to "[a]ll tribes of which the child may be a member or citizen, or eligible for membership or citizenship" unless the tribe has determined that the child is not a member or citizen or eligible for membership or citizenship, or the juvenile court has made a determination as to which tribe is the child's tribe in accordance with section 224.1, after which notice need only be sent to the Indian child's tribe. (§ 224.3, subd. (a)(3)(A)(i)–(ii).) Father does not challenge the juvenile court's determination that NVB was C.D.'s tribe for purposes of providing ICWA notice.

speaking, these review hearings may culminate in one of several possible outcomes: return of the child to the parents; continued reunification services; or termination of services and scheduling of a section 366.26 hearing. (§§ 366.21, subds. (e)–(h), 366.22, subds. (a)–(b).) As such, a six, twelve, or eighteen-month review hearing is not one which "may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement" for purposes of sections 224.1 and 224.3. (§ 224.3, subds. (a) & (b).) Accordingly, section 224.3's notice provisions did not apply to the hearing in question.

More to the point, review hearings under sections 366.21 and 366.22 are subject to notice under a different statutory section. "For any hearing that does not meet the definition of an Indian child custody proceeding set forth in Section 224.1, or is not an emergency proceeding, notice to the child's parents, Indian custodian, and tribe shall be sent in accordance with Sections 292, 293, and 295." (§ 224.3, subd. (g).) Section 293—which governs "notice of the review hearings held pursuant to Section 366.21, 366.22, or 366.25"— states in relevant part that notice must be served on a known Indian child's tribe by first-class mail addressed to the last known address of the person to be noticed, by personal service, or by electronic service pursuant to section 212.5. (§ 292, subds. (a)(6), (e).) The Bureau complied with these requirements by serving notice of the October 10, 2022, review hearing on Kaleak, NVB's designated agent for service, by certified mail.

Although it was revealed at the hearing that Kaleak was no longer employed with NVB, the record is unclear whether her employment ended before or after the date of service of the notice in question. More importantly, there is no dispute that service of the notice resulted in actual notice to NVB of the October 10, 2022, hearing, as it was apparently this notice that

11

precipitated the communication that Kaleak no longer worked for NVB. Thus, the Bureau complied, if not technically then substantially, with the applicable ICWA notice provisions to give the tribe actual notice of the review hearing. (See *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421–1422 [recognizing cases holding that technical compliance is not required where there has been substantial compliance with ICWA notice provisions resulting in actual notice to tribe].)

Section 224.3, subdivision (a)(2), did not require that additional notice be given to NVB's chairperson. As discussed, section 224.3's notice provisions do not apply here because a review hearing under sections 366.21 or 366.22 is not one which may culminate in foster care placement, termination of parental rights, preadoptive placement, or adoptive placement. (§ 224.3, subd. (a).) But even if section 224.3 did apply, the statute, reasonably construed, requires that notice be given to a tribe's chairperson when the tribe lacks a designated agent for service of process. Kaleak's cessation of employment with NVB at an unspecified time does not demonstrate that the tribe lacked a designated agent for service of process at the time the notice in question was served.[5]

25 Code of Federal Regulations, part 23.105, does not compel a different conclusion. That regulation states in relevant part: "If you do not have accurate contact information for a Tribe, or the Tribe contacted fails to

---

[5]     We also observe that notice was served electronically on Daira Pico of NVB. We take judicial notice sua sponte (Evid. Code, §§ 452, subds. (c), (h), 459) that Pico is currently listed on BIA's "ICWA Designated Agents Listing" for NVB. (See https://www.bia.gov/bia/ois/dhs/icwa/agents-listing/locations/native-village-of-barrow-inupiat-traditional-government [as of Dec. 23, 2022].) Section 293, subdivision (e), allows for electronic service pursuant to section 212.5, and Father does not contend that electronic service under section 212.5 was improper in this case.

12

respond to written inquiries, you should seek assistance in contacting the Indian Tribe from the BIA local or regional office or the BIA's Central Office in Washington, DC." (25 C.F.R. § 23.105(c).) In other words, the regulation advises those who cannot make contact with a tribe to seek BIA's assistance. Here, the Bureau and NVB were in regular contact throughout the dependency proceedings. Accordingly, BIA's assistance was not necessary to effectuate service of the hearing notice on NVB.

Father's case authorities are likewise inapposite. In *In re Nikki R.* (2003) 106 Cal.App.4th 844, the record contained "no evidence" that the child welfare agency "made any effort to elicit information about [the child's] Indian heritage," and furthermore, the information that the agency gave to BIA and the Cherokee Nation omitted critical information. (*Id.* at pp. 849–851.) In the other cases cited by Father, the child welfare agencies and the juvenile courts similarly failed to make adequate inquiries into whether the dependent children were Indian children. (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 257–258; *In re Marinna J.* (2001) 90 Cal.App.4th 731, 739.) Such lack of effort stands in sharp contrast to the situation here, where the record discloses that the Bureau actively sought to determine that C.D. was an Indian child, successfully arranged for C.D.'s enrollment in NVB, and then complied with section 293 in giving NVB notice of the review hearing.

Finally, Father contends the Bureau improperly assumed that NVB did not want to participate in the contested review hearing and that the tribe had sufficient information to make the decision of whether or not to intervene. According to Father, the Bureau should have made "extra effort since the minor was in fact a registered Indian child," and should have given the tribe copies of or access to all reports in the case. However, Father cites no

13

supporting legal authorities and therefore forfeits these contentions. (See *In re A.C.* (2017) 13 Cal.App.5th 661, 672–673 [appellate court may deem arguments waived for failure to present supporting legal authority].)

In any event, we conclude the Bureau's compliance with the notice provisions of section 293 was reasonably calculated to give NVB sufficient information and opportunity to participate in the proceedings, particularly in light of the record as a whole. Not only did the Bureau give NVB notice of the October 10, 2022, review hearing, but the Bureau was in regular contact with NVB family advocate Gatten throughout the proceedings, providing her with C.D.'s enrollment application and supporting documentation and keeping her apprised of the status of the proceedings, including the child's placement with his paternal uncle—an enrolled member of NVB. Furthermore, given C.D.'s status as a known Indian child, the Bureau will be required to give NVB timely notice of the upcoming section 366.26 hearing (§ 224.3, subd. (a)), which will provide NVB with another opportunity to intervene if it so desires.

For these reasons, we conclude the juvenile court did not err in concluding that the Bureau complied with the applicable ICWA notice provisions.

## B. Request to Continue Permanency Review

Father contends the juvenile court abused its discretion in terminating reunification services and setting a section 366.26 hearing because there was evidence that Father had a good relationship with C.D. and that he wanted to participate in substance abuse treatment but needed more time. We find no abuse of discretion.

"If the child is not returned to a parent or legal guardian at the permanency review hearing and the court determines by clear and convincing evidence that the best interests of the child would be met by the provision of

14

additional reunification services to a parent or legal guardian who is making significant and consistent progress in a court-ordered residential substance abuse treatment program, . . . the court may continue the case for up to six months for a subsequent permanency review hearing, provided that the hearing shall occur within 24 months of the date the child was originally taken from the physical custody of his or her parent or legal guardian. The court shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (§ 366.22, subd. (b).)

By the time of the October 10, 2022, hearing, C.D. had been detained for 20 months. Thus, assuming the statutory criteria were satisfied, the juvenile court had discretion to continue the permanency planning hearing and services to Father for an additional four months. (§ 366.22, subd. (b).) However, on the record before us, the court reasonably concluded that a further continuance was not justified. As recounted above, the record contains substantial evidence that Father's visitation with C.D. was not consistent and that he did not make significant and consistent progress in addressing his substance abuse or in attending parenting classes. The record confirms that the Bureau made reasonable efforts to accommodate Father's work schedule so that he could participate in his case plan, and Father does not contend otherwise.

Additionally, Father does not contend there was a substantial probability that C.D. could be returned to his physical custody within the time of the requested continuance as required under section 366.22, subdivision (b). In order to make this determination, the juvenile court was

15

"required to find" that Father consistently and regularly visited with C.D., that he made significant and consistent progress in resolving the problems that led to the child's removal, and that he demonstrated the capability and ability to complete the objectives of Father's substance abuse treatment plan. (§ 366.22, subd. (b)(1)–(3).) Based on Father's inconsistent visitation and lack of drug testing, the court could reasonably conclude there was no substantial probability that C.D. could be placed in Father's physical custody if the matter were continued for an additional four months.

For these reasons, we conclude the juvenile court did not abuse its discretion in terminating reunification services and setting the section 366.26 hearing.

<b>DISPOSITION</b>

Father's petition for extraordinary relief is denied. This opinion shall become final immediately upon filing. (See Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).) Father's request for a stay of the permanency planning hearing is denied as moot.

FUJISAKI, J.

WE CONCUR:

TUCHER, P.J.

PETROU, J.

*S.D. v. Superior Court* (A166363)